THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
THOMAS FABING, Defendant-Appellant.

First District (1st Division)   No. 1—88—1492

Opinion filed September 30, 1991.

Michael D. Fabing, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and David Butzen, Assistant State's Attorneys, of counsel), for the People.

Cassiday, Schade & Gloor, of Chicago (Michael J. Gallagher, Gregory E. Schiller, and Patricia A. Bove, of counsel), for *amicus curiae* Chicago Herpetological Society.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendant Thomas Fabing was charged with four counts of violating the Illinois Dangerous Animals Act (Ill. Rev. Stat. 1987, ch. 8, par. 240 *et seq.*) (the Act) in that he unlawfully possessed the following four "life-threatening" reptiles: a four-foot alligator, a seven-foot boa constrictor and two Burmese pythons, each approximately 15 to 20 feet in length. After a trial in the circuit court of Cook County, defendant was convicted of all four counts and fined $100. On defendant's initial appeal to this court (*People v. Fabing* (1990), 196 Ill. App. 3d 495, 554 N.E.2d 294 (*Fabing I*)), we held the term "life-threatening" within the Act to be unconstitutionally vague on its face. The supreme court, however, reversed and remanded, finding: (1) the Act was facially valid; (2) the Act was valid as applied to defendant's pythons and alligator; and (3) the Act was invalid as applied to defendant's boa constrictor. (*People v. Fabing* (1991), 143 Ill. 2d 48, 570 N.E.2d 329 (*Fabing II*).) We now address, as directed by the supreme court, the issue we did not reach in our first disposition: whether the State proved defendant's two pythons and alligator to be "life-threatening" beyond a reasonable doubt.[1]

Our resolution of the issue before us is governed by the *Fabing II* court's definition of "life-threatening." Initially, we note that the court's opinion can potentially be read as giving conflicting definitions for that term. The court first defined the term as follows:

> "We believe the term 'life-threatening' is commonly understood to mean that which *might possibly* attack humans, and which is reasonably capable of killing humans in the event of such an attack." (Emphasis added.) (*Fabing*, 143 Ill. 2d at 55, 570 N.E.2d at 332-33.)

Later, however, in applying this definition, the court applied a reasonableness standard, and not a mere possibility standard, which the language highlighted above implies. For example, in concluding that the Act foreclosed as an available defense the domestication of defendant's reptiles, the court stated:

> "Therefore, under the Act, the temperament of each individual reptile may not be considered when determining whether that

---

[1]Defendant correctly asserts that the State had the burden of proving that defendant owned, kept or harbored a dangerous animal. (See Ill. Rev. Stat. 1987, ch. 8, par. 241.) Since no issue exits whether defendant possessed the reptiles, our determination is limited to whether sufficient evidence existed to prove the life-threatening element beyond a reasonable doubt.

reptile is life-threatening. Rather, we find that a determination of whether it is *reasonably possible* that an animal will attack humans must be made on a species-wide basis." (Emphasis added.) (*Fabing*, 143 Ill. 2d at 56-57, 570 N.E.2d at 333.)

The court again repeated the reasonableness language later in the opinion:

"Regardless of the snakes' dietary preferences, we believe the testimony at trial showed that it is *reasonably possible* that the two 15- to 20-foot pythons would attack humans. The expert testimony showed it is possible that a snake could mistake a human for prey, and thus constrict around the person. Also, testimony showed that the snakes might constrict as a means of self-defense if they were gripped tightly. More importantly, both expert witnesses testified that they are aware of reports of incidents in which giant constricting snakes have killed children, although neither expert was familiar with the details of any of these incidents. We believe that this testimony shows that given the nature of giant constricting snakes, it is *reasonably possible* that these snakes would constrict around a human." (Emphasis added.) *Fabing*, 143 Ill. 2d at 57, 570 N.E.2d at 333-34.

■ Notwithstanding the court's initial definition of "life-threatening," we interpret *Fabing II* as establishing a test in which an animal will be considered "life-threatening" under the Act when the following two requirements are met: First, there must exist a reasonable possibility that the reptile will attack a human. Second, in the case of such an attack, the reptile is reasonably capable of killing. Additionally, and consistent with *Fabing II*, these requirements must be determined on a species-wide basis, with consideration given to characteristics common to other members of the relevant species; the individual temperament of the reptile in question may not be considered. *Fabing*, 143 Ill. 2d at 56-57, 570 N.E.2d at 333.

Applying the above definition to the facts of the case, we believe the State proved defendant's two Burmese pythons to be life-threatening beyond a reasonable doubt, but failed to prove defendant's alligator to be life-threatening beyond a reasonable doubt. With respect to the former, Charles Hill testified as an expert witness for the State that he is senior keeper of the reptile house at the Lincoln Park Zoo in Chicago and has been involved with reptiles for the past 18 years. Through his experiences at the zoo, he has been exposed to Burmese pythons.

Hill testified that Burmese pythons are inherently wild, dangerous and unpredictable. Even when tamed and possessive of a history of docility, the possibility that a Burmese python will attack a human always exists. Hill opined that any constrictor 10 feet or more in length was life-threatening and, therefore, defendant's pythons were life-threatening to adults and children because they exceeded this length.

On cross-examination, Hill conceded that python attacks on humans are rare and that, in general, pythons do not attack people. Apart from Hill's awareness of a single case in St. Louis where a person had been killed by an African python snake, and apart from his reading in unidentified literature of attacks in the wild, he was unaware of any reliable accounts of constricting snakes killing humans. Hill did testify, however, that a constricting snake will constrict to defend itself and that it is possible that a snake may mistake an arm or leg as an item of food.

Dr. Michael Corn testified as an expert for the defense that pythons which are handled frequently by humans become completely complacent and will virtually never attempt to bite a human. Wild pythons, on the other hand, can be quite mean and frequently bite. Corn, however, described their bite as not life-threatening.

Corn testified that he has read unsubstantiated reports in newspapers where Burmese pythons have been found in the same room with individuals who had been suffocated to death. Corn explained, however, that none of these reports have made it into scientific journals. Corn further noted a book on giant reptiles which discussed pythons killing humans. Other than these circumstances, Corn noted no other reports of pythons killing humans.

Corn testified that large pythons such as defendant's could eat a mammal the size of a small pig, but that usually captive snakes stick to a certain food to which they have become accustomed. Corn stated that tamed pythons do not regard people as food.

Corn opined that Burmese pythons as a species are very docile. This fact was important to Corn because a snake's demeanor or tameness is a better measure of the snake's threat to humans than its size. Corn suggested that while a "huge," wild snake may be life-threatening, tame snakes such as defendant's two pythons are not. Corn defined a life-threatening reptile as one that can kill or is likely to kill a human. Corn opined that defendant's snakes were not life-threatening.

On cross-examination, Corn denied that pythons are unpredictable and claimed that captive snakes act very consistently. He did admit,

however, that snakes had the potential to kill but reiterated that each snake's temperament must be considered.

Corn admitted that it was possible for a snake to mistake a body part or a small child as a food item. Corn further admitted that if a child came in contact with a rabbit, and then stuck its hand in a snake's cage, the snake could bite the child's hand.

Regarding defendant's alligator, Corn testified it was not life-threatening. Corn has heard reports of alligators killing humans, but none to his knowledge were under eight feet. Corn noted that alligators tame very nicely.

Other than introducing a photograph of defendant's alligator into evidence, the State introduced no evidence on the issue of whether defendant's alligator was life-threatening.

In assessing the sufficiency of the evidence, it is not our function to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) The relevant question is whether, after viewing all the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 267.

■ In this case, as to defendant's pythons, we believe the evidence shows that they may be properly classified under the Act as life-threatening. A reasonable possibility exists that a 15- to 20-foot Burmese python will constrict around a human. Further, this size of snake is reasonably capable of killing a human. Both experts noted the occurrence of snake attacks on humans and that pythons constrict in self-defense. The experts additionally noted the physical capability of large snakes to kill. As the supreme court observed in *Fabing II*, "[h]uman psychology is an inexact science, and we see no reason to believe that reptile psychology is capable of a greater degree of accuracy." (*Fabing*, 143 Ill. 2d at 56, 570 N.E.2d at 333.) We believe the evidence supports this observation.

■ As for defendant's alligator, we find that the State failed to prove it life-threatening beyond a reasonable doubt. Other than introducing a picture of the alligator into evidence, and the following testimony of Dr. Corn upon cross-examination, the State failed to introduce any evidence.

> "Q. In your opinion, could the seven foot or, I forgot what size you conceived the Boa Constrictor to be, could that Boa Constrictor kill an infant or toddler?
>
> A. No.

MR. FABING: I object to evidence to infants or toddlers. There's no evidence that snakes near infants or toddlers—

THE COURT: Overruled, he may answer.

Q. What about the four foot alligator?

A. What, kill an infant or toddler.?

Q. Yes.

A. No."

As the above passage indicates, Dr. Corn denied the ability of defendant's alligator to kill an infant. We recognize evidence exists showing that alligators as a species are life-threatening. The issue presented before us, however, is whether *defendant's* alligator is life-threatening. The State utterly failed to present any evidence on this point. Defendant's evidence was consistent with the conclusion that his alligator was not life-threatening. Given the State's failure to come forward with any evidence on the issue, we conclude that the State failed to prove defendant guilty of possessing a life-threatening alligator beyond a reasonable doubt.

We recognize our decision as to defendant's pythons may operate harshly on the large body of snake owners in this State. What the legislature has effectively done is to allow the sale of constricting snakes on the one hand, but require owners to forfeit such snakes after they reach a given size. Testimony shows that these snakes grow quickly and, therefore, only a short time will pass before newly purchased snakes becomes illegal under the Act. We believe, however, that any redress of the problem rests with the legislature, not this court.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed in part and reversed in part. We also affirm the $100 fine imposed upon defendant, as the amount was both statutorily proper (see Ill. Rev. Stat. 1987, ch. 38, par. 1005—9—1) and within the circuit court's discretion.

Affirmed in part and reversed in part.

MANNING, P.J., and CAMPBELL, J., concur.